UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> STMICROELECTRONICS, INC., and STMICROELECTRONICS, S.R.L., <br><br> Defendants. | Case No. C-14-03236-RMW <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** <br><br> [Re Docket No. 80] |

Plaintiff Cisco Systems Inc.'s ("Cisco") third amended complaint ("TAC") against defendant STMicroelectronics, Inc. ("ST Micro-US") and STMicroelectronics, S.r.l. ("ST Micro-Italy") alleges claims of negligence, negligent and intentional misrepresentations, negligent and intentional interference with prospective economic advantage, and intentional interference with existing contractual relations Dkt. No. 73 (TAC). ST Micro-US filed a motion to dismiss ("MTD") the TAC under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) on the grounds that it fails to state a claim upon which relief can be granted. Dkt. No. 80 (MTD). For the reasons stated below, the court GRANTS defendant's motion to dismiss as to the equitable estoppel issue and otherwise DENIES the motion to dismiss.

## I.   BACKGROUND

This dispute centers on the unusually high failure rates of cable set-top boxes sold by Cisco to cable companies in India. Cisco is a major supplier of set-top boxes in India. TAC ¶ 24.  By mid-2013, the Indian set-top market had become an important source of revenue for Cisco and Cisco anticipated continued growth in the market. TAC ¶ 1.  Cisco used the Viper17LN chip ("Viper chip") in the power supply units of its set-top boxes. TAC ¶ 2. The Viper chip was manufactured by various subsidiaries of STMicroelectronics, N.V. Defendant ST Micro-US is one subsidiary of ST Microelectronics, N.V., but is not the manufacturer of the Viper chip. The court refers to the parent together with its various subsidiaries collectively as "ST Micro", except as otherwise specified.

In 2012 ST Micro changed its process for manufacturing the Viper chip.  TAC ¶ 29.  ST Micro did not inform Cisco of these changes when they were made. TAC ¶ 29. The changes led the Viper chips to experience excessive leakage of current (referred to as IDSS leakage), which in turn led to overheating of the chip and shut-down of the set-top box. TAC ¶ 30.

In May 2013, one of Cisco's set-top box manufacturers observed failures with the Viper chip. TAC ¶ 34. Cisco reported the potential problem to ST Micro and sent the chip in for failure analysis. TAC ¶ 34. ST Micro generated a Customer Complaint Report which concluded that the defect was random in nature, and that the Viper chip was not defective. TAC ¶ 34.  Nonetheless, ST Micro decided to make further changes in its manufacturing processes. Dkt. No. 74-3, Ex-1 to TAC. Cisco alleges that ST Micro would not have made these changes unless it knew that the Viper chips had a "significant latent defect escape problem or, at least, the potential for a latent defect." TAC ¶ 36. According to Cisco, the manufacturing changes did not solve the IDSS leakage problem. TAC ¶ 36.

Indeed, through further communications involving employees of ST Micro-US and other ST Micro subsidiaries, Cisco reported that Viper chips continued to fail. On June 10 and 12, 2013, Cisco communicated to ST Micro-US a preliminary analysis indicating that ST Micro's chip was defective and causing set-top failures, and sought ST Micro's assistance with addressing and remedying the set-top failures. TAC ¶¶ 51, 52. ST Micro promised to provide Cisco its full assistance, including complete and accurate information regarding the Viper chip and the measures

1    ST Micro was taking to identify and solve the leakage issue. TAC ¶ 4. ST Micro-US provided Cisco
2    with a list of employees from different ST Micro offices or subsidiaries, including subsidiaries
3    located in U.S.A., Italy, China, and Hong Kong. TAC ¶ 42. ST Micro represented to Cisco that
4    these employees were knowledgeable about the Viper chip defect and could help analyze the set-top
5    box failures. TAC ¶¶ 42, 54. Cisco frequently communicated with this "core group" from ST Micro
6    while ST Micro investigated the issue. TAC ¶ 54.

7    From June 2013 to September 2013, ST Micro assured Cisco that its manufacturing changes
8    had solved the leakage problem. However, Cisco continued to observe abnormal failure rates, even
9    with chips from manufacturing lots that ST Micro assured Cisco were fixed. TAC ¶¶ 57-111.
10   Throughout this process, Cisco communicated with ST Micro's "core group" in charge of the Viper
11   chip issue, including employees of ST Micro-US. TAC ¶ 102.

12   Finally, in November 2013 ST Micro provided Cisco with an official communication
13   acknowledging the Viper chip problems. TAC ¶¶ 126, 129. Up to that point, ST Micro had refused
14   to acknowledge that the Viper chip was the sole root cause of the set-top failures. In December the
15   two companies met to conduct tests on 155 set-top boxes that had Viper chips.  TAC ¶ 131-33.
16   Following these tests, an ST Micro employee represented on behalf of ST Micro that the "Viper
17   chip did have a problem, and any statement by any ST Micro representative to the contrary was
18   incorrect." TAC ¶¶ 134-35.

19   On December 19, 2013, ST Micro sent Cisco a final PowerPoint presentation acknowledging
20   responsibility for the Viper chip issue, its improper reaction to the situation, and summarizing its
21   responsibility. TAC ¶¶ 136-37.

22   Throughout the period relevant to this complaint (from June 10, 2013 to approximately
23   December 2013), Cisco also alleges that a group of employees from ST Micro-US and other ST
24   Micro subsidiaries, collectively called "Participating Officers," acted in a civil conspiracy to deny,
25   omit, and subsequently defraud Cisco regarding the nature, scope, and extent of the Viper chip
26   issue. TAC ¶¶ 145-155.

27   Specifically, on "information and belief," Cisco makes the following allegations:
28

Starting on June 10, 2013, Perry Mason (ST Micro-US) recruited Michael Cosson (ST Micro-US) and Charlie Zhu (ST Micro-China) to help conceal from Cisco information known to ST Micro-US about the issue with the Viper chip, including the failure rate, the root cause of the failure, and the Viper chip's role in causing the set top failure. From June 10 to June 19, the above group recruited at least another eight officers from ST Micro-Italy and ST Micro-China to join the conspiracy. During this first stage, the conspiracy involved the omission of critical information that ST Micro promised to provide to Cisco. TAC ¶¶ 145-147.

During the second stage of the conspiracy ending approximately on June 24, the conspiracy grew to include at least 19 Participating Officers from ST Micro-US, ST Micro-Italy, and ST Micro-China. In this second stage, the conspiracy involved omissions and misstatements made during conference calls and in emails to Cisco. These communications assured Cisco that the Viper chips did not have a widespread issue, even though the officers knew that the Viper chips had an abnormally high rate of failure due to a latent defect. TAC ¶¶ 148-150.

During the third stage of the conspiracy, through a conference call with Cisco and through an inaccurate report, the Participating Officers told Cisco that the Viper chips date-coded 309 and above were defect-free and that the Viper chips had been treated with a baking process, even though the Participating Officers knew these statements were not true. TAC ¶ 151.

Finally, during the fourth stage of the conspiracy, the Participating Officers conspired to delay providing Cisco with confirmatory information regarding the Viper chip and stall implementation of a correction of the latent defect. TAC ¶ 152.

**II.   ANALYSIS**

**A.  Standard for Motion to Dismiss**

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at

678 (quoting *Twombly*, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Contreras v. JPMorgan Chase*, No. 14-CV-01145-JGB (DTBx), 2014 WL 4247732 (C.D. Cal. Aug. 28, 2014).

Although the scope of review is limited to the contents of the complaint, the court may also consider exhibits submitted with the complaint. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).

Defendant moves to (1) dismiss with prejudice all of plaintiff's claims to the extent that they are predicated on derivative liability for the alleged actions of others because plaintiff fails to properly allege a civil conspiracy as a basis for imposing derivative liability on ST Micro-US, and (2) to dismiss the claim for intentional interference with existing contractual relations in its entirety because plaintiff fails to allege each element of the claim asserted.

### B. Cisco's TAC Contains Sufficient Factual Allegations to Support a Civil Conspiracy Theory

This court previously held that Cisco had failed in the First Amended Complaint (FAC) to allege an agreement between ST Micro-US and other ST Micro subsidiaries to commit a wrongful act. Dkt. No. 48 ("Order") at 5. Cisco subsequently amended its allegations supporting a civil conspiracy by adding Section IV to the TAC. The TAC now alleges a concerted effort by the Participating Officers to defraud Cisco. TAC ¶¶ 145-155. Defendant argues that these new allegations, which were made "on information and belief," are not sufficient to support a theory of conspiracy. MTD at 10-12. The court finds that the TAC alleges sufficient facts to support secondary liability of ST Micro-US under a theory of civil conspiracy.

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.

4th 503, 510-11 (1994). The elements of an action for civil conspiracy are (1) the formation and operation of the conspiracy and (2) damage resulting to plaintiff from (3) an act or acts done in furtherance of the common design. *Id.* at 511. To allege the formation and operation of the conspiracy, plaintiff must allege, at a minimum, an agreement to commit the wrongful acts. *Wasco Products, Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). The conspiracy "may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *117 Sales Corp. v. Olsen*, 80 Cal. App. 3d 645, 649 (1978). But when a plaintiff alleges that a defendant is liable for intentional misrepresentations under a civil conspiracy theory, Rule 9(b) requires that the plaintiff allege with particularity facts that support the existence of a civil conspiracy. *Palomares v. Bear Stearns Residential Mortg. Corp.*, No. 07-CV-01899(WQH), 2008 WL 686683 (S.D. Cal. Mar. 13, 2008).

The Second Circuit has held that the *Twombly* plausibility standard allows factual allegations made "upon information and belief" where "(1) the facts are peculiarly within the possession and control of the defendant, or (2) where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Specifically, allegations made "upon information and belief" are appropriate where (1) the support for the claims turns on the content of records held by the defendants, or (2) where there is other factual information elsewhere in the complaint upon which the allegations are based. *Id.*

The court finds that Cisco has satisfied the *Arista* standard because the substance of the claims turns on records and internal communications exclusively controlled by the defendant. Cisco has also supported its allegations of a civil conspiracy with specific facts. Cisco has alleged which officers participated in the conspiracy, the general timeline of the conspiracy, the underlying wrongful acts carried out by the conspiracy, and the underlying motive of the co-conspirators. TAC ¶¶ 145-155. The added allegations cure the defects of the conspiracy allegations in the FAC by going beyond mere exchanges of information between ST Micro employees regarding the Viper chip issue accompanied by threadbare legal conclusions. With the addition of these new allegations to the TAC, Cisco has alleged sufficient facts to allow a plausible inference of a civil conspiracy in the context of this case.

### C. Cisco Can Plead Secondary Liability for Negligence, Negligent Misrepresentations, and Negligent Interference with Economic Advantage Through a Civil Conspiracy

ST Micro-US moves to dismiss the negligence-based claims to the extent that they are predicated on a civil conspiracy, arguing that it is both logically and legally impossible for parties to agree to fail to exercise due care. MTD at 12. The court finds that imposing secondary liability on ST Micro-US for negligence, negligent misrepresentation, and negligent interference with prospective economic advantage based on an alleged civil conspiracy to commit an intentional wrongful act is permissible.

Generally, a civil conspiracy requires (1) an agreement to commit a wrongful act, (2) commission of a wrongful act, and (3) damages arising from the wrongful conduct. *Kidron v. Movie Acquisition Co.*, 40 Cal.App.4th 1571, 1581 (1996). Here, Cisco alleges that ST Micro-US and ST Micro-Italy (and others) agreed to defraud Cisco, and committed both intentional and negligent acts in furtherance of that agreement, which acts damaged Cisco. Thus, there was not "a conspiracy to commit negligence," which courts have found improper, but rather negligence carried out in furtherance of a conspiracy. *See McKay v. Hageseth*, No. 06-CV-1377-MMC, 2007 WL 2669934 (N.D. Cal. Sept. 7, 2007); *Koehler v. Pulvers*, 606 F. Supp. 164, 173 (S.D. Cal. 1985) (noting lack of "California decisional authority imposing liability for conspiring to commit negligence" and observing that "allegation of civil conspiracy appears inherently inconsistent with the allegation of an underlying act of negligence.").

In other words, Cisco must show that the ST Micro co-conspirators entered into an agreement to commit some intentional wrongful act. Cisco may not rely on an agreement to commit a negligent act. *Mendez v. County of Alameda*, No. 03-CV-4485-PJH, 2005 WL 3157516 at *12 (N.D. Cal. 2005) (holding "the law does not recognize a conspiracy *to commit negligence*"; observing "[i]t is a non sequitur to speak of parties intentionally agreeing to fail to exercise due care" (emphasis added)). However, once an agreement to commit an intentional wrongful act is shown, any wrongful acts—negligent or intentional—taken in furtherance of the conspiratorial agreement are attributable to all members of the conspiracy (barring withdrawal or some other defense not yet relevant here). The wrongful act agreed to need not be the exact same wrongful act carried out in furtherance of the agreement.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS THE TAC
Case No. C-14-3236-RMW
VN
- 7 -

As stated above, Cisco has alleged sufficient facts to allow a plausible inference that ST Micro-US intended to enter an agreement to defraud Cisco, and thus the negligence-based claims will be allowed to proceed, including any portion that is predicated upon a theory of conspiracy.

**D. Equitable Estoppel Cannot Be Used Offensively to Impose Derivative Liability**

ST Micro-US also moves dismiss any claims premised on an equitable estoppel theory. MTD at 13. Specifically, ST Micro-US asks the court to find that Cisco cannot "assert estoppel as an additional basis for derivative liability beyond conspiracy." *Id.* The court agrees with ST Micro-US that equitable estopped cannot be used to impose secondary liability on ST Micro-US. Cisco may use the communications amongst the various ST Micro employees as evidence to support its claims, but cannot rely on equitable estoppel as a separate theory of secondary liability.

As at common law, the doctrine of equitable estoppel has traditionally been allowed only as a defense in this jurisdiction and others. MTD at 13; *see Kanematsu Corp. v. Multimedia Access & Retrieval Corp.*, No. 02-CV-1543-SC, 2002 WL 31268388, at *4 (N.D. Cal. Oct. 7, 2002); *EOS GmbH Electro Optical Sys. v. DTM Corp.,* Nos. SACV 00-1230 DOC (MLG), SACV 02-0449 DOC (MLG), 2004 WL 5683723, at *5 (C.D. Cal. Jan. 12, 2004). In contrast, promissory estoppel is typically employed for offensive purposes. The doctrine of equitable estoppel is typically raised as a defense "to prevent the party estopped from alleging or relying upon some fact or theory that would otherwise permit him to recover something from the party asserting estoppel." *Green v. Travelers Indem. Co.*, 185 Cal. App. 4d 544, 555 (1986).

Here, Cisco is attempting to estop ST Micro-US from denying statements made by the employees of ST Micro-Italy and ST Micro-China, in order to impose liability on the ST Micro-US. Specifically, Cisco believes that ST Micro-US should be estopped from denying responsibility for the actions, omissions, and statements made by ST Micro-Italy and ST Micro-China officers, because ST Micro-US, at all times during its communication with Cisco, represented to Cisco that the foreign-based officers were knowledgeable about the Viper chip issue and were providing Cisco

with complete and accurate information. TAC ¶¶ 51-137, 156. Thus Cisco is using equitable estoppel to impose liability on ST Micro-US, not to shield itself against liability. This use of equitable estoppel is inconsistent with the traditional defensive concept of equitable estoppel and has not received widespread recognition by courts. The court declines to extend the use of equitable estoppel to this situation. Of course, Cisco need not rely on equitable estoppel to impose derivative liability upon ST Micro-US, as the court has held above that Cisco has alleged sufficient facts to proceed under a civil conspiracy theory.

### E. Cisco Adequately Pleads the Claim of Intentional Interference with Existing Contractual Relations

In order to plead a claim of intentional interference with existing contractual relations, a plaintiff must allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998) (internal quotation omitted). ST Micro-US moves to dismiss the claim of intentional interference with existing contractual relations in the TAC because it believes that Cisco has failed to allege sufficient facts as to elements (1), (3), and (4) above. MTD at 14, 15.

As explained below, the court finds that Cisco has satisfied its pleading requirements for the claim for intentional interference with existing contractual relations in the TAC.

#### 1. The TAC Contains Adequate Allegations of the Existence of a Valid Contract Between Plaintiff and a Third Party

As to the first element of the asserted claim, the court finds that Cisco has sufficiently alleged facts establishing the existence of a class of valid contracts. Plaintiff must allege sufficient facts "to allow the defendants to understand the claims brought against them." *Swingless Golf Club Corp. v. Taylor*, No. 08-CV-05574-WHA, 2009 WL 2031768, at *4 (N.D. Cal. July 7, 2009) (quoting *Castaneda v. Burger King Corp.*, 597 F. Supp. 2d 1035, 1046 (N.D. Cal. 2009)). The level of specificity required lays somewhere between bare, "conclusory allegation" of a "valid and existing agreement," which courts have rejected, and detailed allegations of each specific term and

parties involved in the contract, which courts have not required. *Hartford Life Ins. Co. v. Banks*, No. 08-CV-1279-WQH, 2009 WL 863267, at *6 (S.D. Cal. Mar. 25, 2009); *Swingless Golf*, 2009 WL 2031768, at *4. Furthermore, courts have found that pending purchase orders can constitute existing contracts. *See, e.g.*, *Unihan Corp. v. Max Group Corp.*, No. CV 09-07921, 2011 WL 6814044, at *7 (C.D. Cal. Dec. 28, 2011); *Diamond Offshore v. Survival Sys. Int'l*, 902 F. Supp. 2d 912, 922-23 (S.D. Tex. 2012); *Select Creations, Inc. v. Paliafito Am., Inc.*, 911 F. Supp. 1130, 1156-57 (E.D. Wis. 1995). The defendant's reply does not contest this. *See* Reply at 13.

Here, Cisco has repeatedly alleged or otherwise implied the existence of the purchase orders throughout the TAC. Cisco allegedly informed ST-Micro on June 26, 2013 that it "had a large backlog of orders caused by the Viper chip failures." TAC ¶¶ 71-72. Again, on September 11, 2013, Cisco allegedly informed ST Micro that it was "in a desperate situation" and "had a lot of customers waiting." TAC ¶ 109. A month later in October, Cisco again allegedly informed ST Micro that it needed "close to half a million Viper chips to handle the backlog of customer orders." TAC ¶ 115. The defendant's argument that the claim should be dismissed because plaintiff fails to include in these allegations that the purchase orders were "valid and enforceable" is hyper-technical and not meritorious enough for the motion to be granted. Reply at 13. Therefore, the court finds that these allegations are adequate for supporting the first element of the claim for intentional interference with existing contractual relations.

### 2. The TAC Contains Adequate Allegations of Defendant's Intentional Act with a Design to Induce a Breach or Disruption of the Contractual Relationship

As to the second element of the asserted claim, the court finds that Cisco has sufficiently alleged facts showing that the defendant committed intentional acts designed to induce a breach or disruption of the contractual relationship.

Cisco has alleged that ST Micro-US, either through communications with Cisco or other means, was aware that Cisco was supplying and repairing set top boxes for the Indian customers (TAC ¶¶ 58, 72, 109), that there was a backlog of repairs and orders for these customers (TAC ¶¶ 57-58, 66, 72, 109, 113-116), and that the backlog increased Cisco's exposure to liability due to its contractual obligations (TAC ¶¶ 58, 109). Thus, Cisco has alleged that ST Micro-US had more than

just "generalized knowledge" of Cisco's business relations, and thus defendant could have formed the requisite intent to engage in the interfering act.

The *Quelimane* court held that the intentional interference does not require a specific intent to cause a breach of contract or to disrupt contractual relations, but it can be intent can be found where the interference is "certain or substantially certain," even if the defendant does not act with "the purpose of interfering with the contract or desire" such results. *Quelimane Co.*, 19 Cal. 4th at 56. The TAC contains allegations and inferences that prolonged delays in repairing and supplying set-top boxes would predictably cause backlash and disruption of contractual relations, which is enough under the *Quelimane* formulation. *See* Opp. at 24.

### 3. The TAC Contains Adequate Allegations that an Intentional Act by the Defendant Disrupted Plaintiff's Contractual Relations

As to the third element of the asserted claim, the court finds that Cisco has alleged sufficient facts to establish that its contractual relations with its Indian customers were indeed disrupted by the intentional acts of the defendant.

The defendant's claim that Cisco fails to allege facts showing actual disruption of valid contractual relations is predicated on its other claim that Cisco fails to allege facts establishing a valid contractual relation (the first element in *Quelimane*). As the court finds that the factual allegations contained in the TAC are sufficient to establish a valid contract, it is the necessary consequence that if Cisco alleges facts showing disruptions to such a contract, Cisco's allegations also sufficiently allege actual disruption of contractual relations.

In the TAC, Cisco alleges that the intentional acts by the defendant resulted in cancellations of existing orders, in inability by Cisco to repair, replace, and supply defect-free set-top boxes, and in extra financial burdens on Cisco to fulfill its contractual obligations. TAC ¶¶ 57-58, 72, 109, 114-115, 117, 139, 140, 141. The court finds that these allegations establish "proof[s] of interference" required for the third element of the claim. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (1990) (holding that interference with plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more

burdensome). Accordingly, defendant's motion to dismiss the claim for intentional interference with existing contractual relations is DENIED.

### III. ORDER

For the reasons explained above, the court GRANTS defendant's motion to dismiss as to the equitable estoppel issue and otherwise DENIES the motion to dismiss.

Dated: June 2, 2015



    Ronald M. Whyte
    United States District Judge